RELATED DDJ

**FILED**
CLERK, U.S. DISTRICT COURT

01/16/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____DVE_____ DEPUTY

1  XINGFEI LUO

2  PO BOX 4886,

3  El Monte, CA 91734

IFP Submitted

4

5  Plaintiff in Pro Se

6

7

8  **UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

9

10

11  XINGFEI LUO,

No. 8:23-cv-00096-MEMF-(KES)

12         Plaintiff,

13         v.

14  TODD SPITZER, in his official
capacity as Orange County District

**VERIFIED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF**

15  Attorney; DAVID VALENTIN, in his
official capacity as Police Chief of

16  Santa Ana Police Department; and
DOES 1-10,

17         Defendants.

18

19

20         Xingfei Luo (Plaintiff), a victim of miscarriage of justice, brings this action against

21  defendants and makes the following allegations.

22                          **INTRODUCTION**

23         1.    This is an action to declare three restraining orders invalid and

24  unconstitutional, and enjoin their enforcement.

25         2.    After Hanh Le's cheating husband and a shameless nudist, Tomas Czodor

26  (CZODOR), faked his damages and injuries, without affording prior notice and an

27  opportunity to be heard, a temporary restraining order (TRO) was entered by Orange

28  County Superior Court on Sep 28, 2018, ordering Plaintiff to remove content from pages

1

on internet what she or her accomplices created to destroy CZODOR's online reputation and to stop posting about CZODOR online, a blanket prohibition of speech on all contents, subjects, viewpoints, and images related to CZODOR or his online reputation which amounts to illegal censorship without determination of what content in deed destroyed CZODOR's online reputation or whether it was protected by First Amendment.

3.    On Oct 19, 2018, without sufficient financial means to secure counsel to defend herself, Plaintiff appeared pro se at a domestic violence restraining order (DVRO) hearing. After a bench trial, a DVRO was entered, ordering Plaintiff to cease posting the picture or likeness of CZODOR or refer to him by name on *any* social media website or blog, and to remove *any* pictures or references of CZODOR from *any* social media website or blog she may have posted, an impermissible post-speech restriction on all contents, viewpoints, and images related to CZODOR.

4.    On Oct 1, 2021, without representation of counsel, Plaintiff sought to terminate the DVRO but a first amended DVRO was entered, ordering Plaintiff to not post *any* pictures or likeness of CZODOR or refer to him by name on *any* social media or website or blog that would be *abusive* pursuant to FC§6203 and FC§6320, and to remove *any* pictures or references of CZODOR from any social media websites or blogs she may have posted. In essence, on one hand the first amended DVRO permits Plaintiff to post any picture or likeness of CZODOR as long as it is not abusive, on the other hand this very order requires Plaintiff to **remove** any picture or references of CZODOR even though they are not abusive.

5.    Plaintiff has filed for habeas corpus relief in the Central District of California arising out of her wrongful conviction, in part, due to violation of invalid and unconstitutional restraining orders. See *Luo v. The People*, Case No. 8:22-cv-01640-MEMF-KES (C.D. Cal.) ("Prior Action"). While the Prior Action is stayed and pending, defendants once again, in January 2023, filed or caused to file a criminal complaint against Plaintiff based on violation of invalid and unconstitutional restraining orders.

6.    Plaintiff seeks a declaration stating that all three restraining orders are in

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  violation of First and Fourteenth Amendments of the United States and an order enjoining

2  Defendants and all their agents from enforcing all three restraining orders against

3  Plaintiffs in violation of her constitutional rights.

4  **JURISDICTION AND VENUE**

5       7.    Plaintiff brings this action pursuant to 42 U.S.C. §1983 for violations of civil

6  rights under the First and Fourteenth Amendments to the United States Constitution.

7       8.    The Court has original jurisdiction of this civil action under 28 U.S.C. §§

8  1331 and 1343, because the action arises under the Constitution and laws of the United

9  States, thus raising federal questions.

10       9.    The Court has jurisdiction under 28 U.S.C. §1343(a)(3) and 42 U.S.C. §1983

11  since this action seeks to redress the deprivation, under color of the laws, statutes,

12  ordinances, regulations, customs and usages of the State of California and political

13  subdivisions thereof, of rights, privileges or immunities secured by the United States

14  Constitution and by Acts of Congress.

15       10.   Plaintiff's claims for declaratory and injunctive relief are authorized by 28

16  U.S.C. §§2201-2202, and her claim for attorneys' fees is authorized by 42 U.S.C. §1988.

17       11.   Venue in this judicial district is proper under 28 U.S.C. §1391(b)(2), because

18  a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in

19  this district.

20  **PARTIES**

21       12.   Plaintiff, at all times herein mentioned, was a resident of the County of Los

22  Angeles, State of California.

23       13.   Defendant Todd Spitzer (Spitzer), sued in his official capacity, is Orange

24  County District Attorney (OCDA). OCDA's office is a municipal governmental entity

25  chartered and established by operation of law and a subdivision of the County of Orange.

26  At all times relevant herein, Spitzer resided within the jurisdiction of the State of

27  California. In January 2023, Spitzer filed or caused to file a criminal complaint against

28  Plaintiff based on violation of invalid and unconstitutional restraining orders.

3

14.    Defendant David Valentin (Valentin), sued in his official capacity, is Police Chief of Santa Ana Police Department. At all times relevant herein, Valentin resided within the jurisdiction of the State of California. In January 2023, Valentin filed or caused to file a criminal complaint against Plaintiff based on violation of invalid and unconstitutional restraining orders.

15.    The true names or capacities—whether individual, corporate, associate, or otherwise—of the Defendants named herein as Does 1-10, are presently unknown to Plaintiff, and are therefore sued by these fictitious names. Plaintiff prays for leave to amend this Complaint to show the true names or capacities of these Defendants if and when they have been determined.

16.    Defendants are responsible for enforcing state law within their jurisdiction.

17.    Defendants enforce restraining orders under California Penal Code [CPC] §273.6(a) – Violation of Court Order under color of state law within the meaning of 42 U.S.C. §1983 and they are in fact presently enforcing restraining orders against Plaintiff.

## BACKGROUND

### The Purpose and Application of The Domestic Violence Prevention Act ("DVPA")

18.    The purpose of DVPA is to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence. Cal. Fam. Code §6220.

19.    "Domestic violence", in relevant part, is abuse perpetrated against a person with whom the perpetrator is having or has had a dating or engagement relationship. Cal. Fam. Code §6211(c).

20.    The Legislature did not intend the statute to apply to acquaintance or stranger violence, nor did it intend to cover the myriad of relationships that exist or even to all those which might be considered "dating" relationships. A dating relationship under DVPA undoubtedly requires something more than a few casual dates.

21.    While judicial discretion and flexibility are appropriate in applying the

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   statutory definition of "dating relationship," they do not relieve a court of its obligation to

2   apply the legislative criteria while it must keep in mind the protective purpose of DVPA.

3   <u>Dating Relationship Defined by DVPA</u>

4   22.   A party is not necessarily entitled to a restraining order simply because the

5   opposing party has engaged in an act that upsets the petitioning party. It is the party

6   seeking a restraining order that bears the burden of establishing the circumstances

7   justifying the order. *Curcio v. Pels* (2020) 47 Cal.App.5th 1, 13 – 14. The moving party

8   for a DVRO must be in a specified domestic relationship with the person to be restrained.

9   Cal. Fam. Code §§ 6211, 6301, subd. (a). The fact the parties are sexually intimate does

10  not, alone, create a dating relationship. *People v. Shorts* (2017) 9 Cal.App.5th 350, 360-

11  361 [defendant and victim had sexual relations one to two times.]

12  23.   "Dating relationship" means frequent, intimate associations primarily

13  characterized by the expectation of affection or sexual involvement independent of

14  financial considerations. Cal. Fam. Code §6210. "Dating relationship" does not apply to 'a

15  casual relationship or an ordinary fraternization between [two] individuals in a business or

16  social context.' *People v. Upsher* (2007) 155 Cal.App.4th 1311, 1323, citing *People v.*

17  *Rucker* (2005) 126 Cal.App.4th 1107, 1117. Had the Legislature intended to apply DVPA

18  to casual dates, it could have simply referred to the dating relationship as "a date" or any

19  dates instead of phrasing it to emphasize the element of frequent and intimate

20  associations.

21  24.   Neither the statute nor California courts ever enumerated the factors to be

22  considered in determining the existence of a "dating relationship." It is not difficult to turn

23  to other jurisdictions, the well-populated states, for guidance in identifying those factors.

24  25.   In the state of Washington, a dating relationship is "a social relationship of a

25  romantic nature" and courts consider the same factors as federal law[1]: length of

---

[1] Under The Violence Against Women Reauthorization Act of 2013 (VAWA), Dating Violence means violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim; and where the existence of such a relationship shall be determined based on a consideration of the following factors:
º  The length of the relationship
º  The type of relationship

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

relationship, type of relationship, and frequency of interactions between the partners. RCW 26.50.010(2).

26. Four factors should be considered in the State of Massachusetts: (1) the length of time of the relationship; (2) the type of relationship; (3) the frequency of interaction between the parties; and (4) if the relationship has been terminated by either person, the length of time elapsed since the termination of the relationship." Mass. Gen. Laws ch. 209A § 1. See *Brossard v. West Roxbury Div. of the Dist. Court Dep't*, 417 Mass. 183, 185, 629 N.E.2d 295 (1994) ("substantive dating relationship" existed where facts revealed "substantially more than a few casual dates").

27. In the state of Texas, "dating relationship" means "a relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature," the existence of which is determined by considering the length and nature of the relationship and the frequency and type of interaction between the persons involved in it. TEX. FAM. CODE § 71.0021(b).

28. Section 784.046, Florida Statutes, provides in relevant parts:

(1)(a) "Violence" means any assault, aggravated assault, battery, aggravated battery, sexual assault, sexual battery, stalking, aggravated stalking, kidnapping, or false imprisonment, or any criminal offense resulting in physical injury or death, by a person against any other person.

(d) "Dating violence" means violence between individuals who have or have had a continuing and significant relationship of a romantic or intimate nature. The existence of such a relationship shall be determined based on the consideration of the following factors:

(1) A dating relationship must have existed within the past six months;

(2) The nature of the relationship must have been characterized by the expectation of affection or sexual involvement between the parties; and

(3) The frequency and type of interaction between the persons involved in the

---

º The frequency of interaction between the persons involved in the relationship

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

relationship must have included that the persons have been involved over time and on a continuous basis during the course of the relationship.

29.   In determining whether a dating relationship actually exists under New Jersey's Prevention of Domestic Violence Act, six factors that should, at a minimum, be considered:

(1) Was there a minimal social interpersonal bonding of the parties over and above a mere casual fraternization?

(2) How long did the alleged dating activities continue prior to the acts of domestic violence alleged?

(3) What were the nature and frequency of the parties' interactions?

(4) What were the parties' ongoing expectations with respect to the relationship, either individually or jointly?

(5) Did the parties demonstrate an affirmation of their relationship before others by statement or conduct?

(6) Are there any other reasons unique to the case that support or detract from a finding that a "dating relationship" exists?

30.   Not every person injured by another is entitled to the protections of the Prevention of Domestic Violence Act (the Act), N.J.S.A. 2C:25–17 to –35. *S.K. v. J.H.*, 426 N.J. Super. 230, 233 (App. Div. 2012).

31.   An interpretation of N.J.S.A. 2C:25–19(d) that would apply the Act to two persons who had a single date would give far too much weight to the word "dating" and too little weight to the word "relationship." If the Legislature intended to permit the Act's protections to apply to persons who had a single date, it would have defined "victim of domestic violence" as any person who has been subjected to violence by a person whom the victim has dated. *S.K. v. J.H.*, 426 N.J. Super. 230, 239 (App. Div. 2012). By requiring evidence of a "dating relationship," the Legislature undoubtedly intended something of **greater frequency** or **longer duration** than a single date. *Id.* See also *Alison C. v. Westcott*, 343 Ill.App.3d 648, 798 N.E.2d 813, 278 Ill.Dec. 429 (2003) (holding that the

7

1   fact that the parties attended the same high school, had spoken on the telephone, and had a

2   single lunch date was not sufficient to establish a dating relationship.) There is no

3   significant difference between a single date and two dates.

4       32.   None of the above states recognizes two casual dates as a dating relationship.

5                                    The Purpose of First Amendment

6       33.   The constitutional right of free expression is powerful medicine in a society as

7   diverse and populous as ours. It is designed and intended to remove governmental

8   restraints from the arena of public discussion, putting the decision as to what views shall

9   be voiced largely into the hands of each of us, in the hope that use of such freedom will

10  ultimately produce a more capable citizenry and more perfect polity and in the belief that

11  no other approach would comport with the premise of individual dignity and choice upon

12  which our political system rests. See *Whitney v. California*, 274 U.S. 357, 375-377 (1927)

13  (Brandeis, J., concurring); *Leathers v. Medlock*, 499 U.S. 439, 448-449 (1991); *Cohen v.*

14  *California*, 403 U.S. 15, 24 (1971).

15      34.   Under our Constitution, "esthetic and moral judgments about art and literature

16  ... are for the individual to make, not for the Government to decree, even with the mandate

17  or approval of a majority." *United States v. Playboy Entertainment Group, Inc*., 529 U.S.

18  803, 818 (2000). The First Amendment's purpose is "to preserve an uninhibited

19  marketplace of ideas in which truth will ultimately prevail," *FCC v. League of Women*

20  *Voters of Cal*., 468 U.S. 364, 377, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (internal

21  quotation marks omitted).

22      35.   In *Carroll v. Princess Anne* (1968) 393 U.S. 175 [21 L.Ed.2d 325, 89 S.Ct.

23  347], the high court invalidated a restraining order prohibiting the continuation of a public

24  rally conducted by a "white supremacist" organization that had been issued ex parte

25  **without notice** to the enjoined parties. In explaining the importance of giving the enjoined

26  parties an opportunity to be heard, the high court in Princess Anne stressed the importance

27  of limiting any order restraining speech: "An order issued in the area of First Amendment

28  rights must be couched in the narrowest terms that will accomplish the pin-pointed

8

1   objective permitted by constitutional mandate and the essential needs of the public order.

2   In this sensitive field, the State may not employ 'means that broadly stifle fundamental

3   personal liberties when the end can be more narrowly achieved.' [Citation.] In other

4   words, the order must be tailored as precisely as possible to the exact needs of the case."

5   *Carroll v. Princess Anne*, supra, 393 U.S. at pp. 183-184.

6            Government's Power to Restrict Expression is Limited and Any

7            Restrictions on Free Expression Must Satisfy Strict Scrutiny

8            36.   "Freedom of speech and freedom of the press, which are protected by the First

9    Amendment from infringement by Congress, are among the fundamental personal rights

10   and liberties which are protected by the Fourteenth Amendment from invasion by state

11   action." *Lovell v. Griffin*, 303 U.S. 444, 450. An individual's right to speak is implicated

12   when information he or she possesses is subjected to "restraints on the way in which the

13   information might be used" or disseminated. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20,

14   32 (1984); see also *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001); *Florida Star v. B.J.F.*,

15   491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989); *New York Times Co. v. United*

16   *States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)(per curiam). In *Seattle Times*,

17   the Court applied heightened judicial scrutiny before sustaining a trial court order

18   prohibiting a newspaper's disclosure of information it learned through coercive discovery.

19           37.   The First Amendment's guarantee of free speech does not extend only to

20   categories of speech that survive an ad hoc balancing of relative social costs and benefits.

21   The First Amendment itself reflects a judgment by the American people that the benefits

22   of its restrictions on the Government outweigh the costs. Our Constitution forecloses any

23   attempt to revise that judgment simply on the basis that some speech is not worth it. The

24   Constitution is not a document "prescribing limits, and declaring that those limits may be

25   passed at pleasure." *Marbury v. Madison*, 5 U.S. 137, 178 (1803).

26           38.   "If there be time to expose through discussion the falsehood and fallacies, to

27   avert the evil by the processes of education, the remedy to be applied is more speech, not

28   enforced silence. Only an emergency can justify repression. Such must be the rule if

1   authority is to be reconciled with freedom." *Whitney v. California*, 274 U.S. 357, 377

2   (1927).

3   39.   The idea of the First Amendment is that freedom and democracy demand

4   strict controls on the government's authority to suppress speech. "[A]s a general matter, ...

5   government has no power to restrict expression because of its message, its ideas, its

6   subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564,

7   573, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002) (internal quotation marks omitted). There

8   are of course exceptions." 'From 1791 to the present,' ... the First Amendment has

9   'permitted restrictions upon the content of speech in a few limited areas,' and has never

10  'include[d] a freedom to disregard these traditional limitations.' "*United States v. Stevens*,

11  559 U.S. 460 (2010) (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 382–383, 112 S.Ct. 2538,

12  120 L.Ed.2d 305 (1992)). These limited areas—such as obscenity, *Roth v. United States*,

13  354 U.S. 476, 483, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), incitement, *Brandenburg v.*

14  *Ohio*, 395 U.S. 444, 447–449, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969)  (per curiam), and

15  fighting words, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed.

16  1031 (1942) —represent "well-defined and narrowly limited classes of speech, the

17  prevention and punishment of which have never been thought to raise any Constitutional

18  problem," id., at 571–572, 62 S.Ct. 766.

19  40.   "Speech may not be banned on the ground that it expresses ideas that offend."

20  *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017). See *IMS Health Inc. v. Sorrell*, 630 F.3d 263,

21  271–272 (2d Cir. 2010) ("The First Amendment protects even dry information, devoid of

22  advocacy, political relevance, or artistic expression" (internal quotation marks and

23  alteration omitted)); *IMS Health Inc. v. Sorrell*, 631 F. Supp. 2d 434, 445 (D. Vt. 2009)

24  ("A restriction on disclosure is a regulation of speech.")

25  41.   "Disgust is not a valid basis for restricting expression." *Brown v.*

26  *Entertainment Merchants Assn*., 564 U.S. 786, 798 (2011). Simple "undifferentiated fear

27  or apprehension of disturbance is not enough to overcome the right to freedom of

28  expression." *Tinker v. Des Moines Independent Community School Dist*., 393 U. S. 503,

508. "An individual confronted with an uncomfortable message can always turn the page, change the channel, or leave the Web site." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014). The mere presumed presence of unwitting listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense. See, e. g., *Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971). It was made perfectly clear that "[s]exual expression which is indecent but not obscene is protected by the First Amendment." *Sable Communications of California, Inc. v. Federal Communications Commission*, 492 U.S. 115, 126 (1989). Sometimes it is necessary to protect the superfluous in order to preserve the necessary. See *Tyson & Brother v. Banton*, 273 U.S. 418, 447, 47 S.Ct. 426, 71 L.Ed. 718 (1927) (Holmes, J., dissenting); see also *Mahanoy Area Sch. Dist. v. B. L.*, 141 S. Ct. 2038, 2048 (2021), refusing to dismiss B. L.'s words, "Fuck school fuck softball fuck cheer fuck everything," as unworthy of the robust First Amendment protections; *Snyder v. Phelps*, 562 U.S. 443 (2011) (finding signs stating "Thank God for Dead Soldiers," "Pope in Hell," "Priests Rape Boys," "God Hates Fags," "You're Going to Hell," and "God Hates You." were entitled to First Amendment protection.)

42.    "Freedoms of speech and press do not permit a State to forbid advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444 (1969).

43.    In *Stevens*, the Court held that new categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated. Stevens concerned a federal statute purporting to criminalize the creation, sale, or possession of certain depictions of animal cruelty. See 18 U.S.C. § 48 (amended 2010). The statute covered depictions "in which a living animal is intentionally maimed, mutilated, tortured, wounded, or killed" if that harm to the animal was illegal where the "the creation, sale, or possession t[ook] place," § 48(c)(1). A saving clause largely borrowed from our obscenity jurisprudence, see *Miller v. California*, 413 U.S. 15, 24, 93

11

S.Ct. 2607, 37 L.Ed.2d 419 (1973), exempted depictions with "serious religious, political, scientific, educational, journalistic, historical, or artistic value," § 48(b). The Supreme Court held that statute to be an impermissible content-based restriction on speech. Without persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription, a legislature, let alone a court order, may not revise the "judgment [of] the American people," embodied in the First Amendment, "that the benefits of its restrictions on the Government outweigh the costs." *United States v. Stevens*, 559 U.S. 460, 130 S.Ct., at 1585.

44.   Even where protection against free speech is the object, the constitutional limits on governmental action apply. "We cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process. Indeed, governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views. We have been able, as noted above, to discern little social benefit that might result from running the risk of opening the door to such grave results." *Cohen v. California*, 403 U.S. 15, 26 (1971).

45.   In a traditional public forum—parks, streets, sidewalks, and the like—the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited. See *Pleasant Grove City v. Summum*, 555 U.S. 460, 469, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009). The government's ability to restrict speech in such forums is "very limited." *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983). In particular, the guiding First Amendment principle that the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content" applies with full force in a traditional public forum. *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). As a general rule, in such a forum the government may not "selectively ... shield the public from some kinds of speech on the ground that they are more offensive than others." *Erznoznik v. Jacksonville*, 422 U.S. 205, 209, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975). See

12

1    also *Snyder v. Phelps*, 562 U.S. 443, 461 (2011) (holding that even when expression

2    "inflict[s] great pain ... we cannot react to that pain by punishing the speaker.")

3                                                     **FACTS**

4                                          Tomas Czodor's Allegations

5          46.    In August 2018 Czodor connected with Plaintiff via online dating while

6    presenting himself as a single man never married. Czodor's communication with Plaintiff

7    was solely via texting other than two in person gathering. Over the entire course of their

8    interaction, Plaintiff never told Czodor her full name. Nor did Czodor tell Plaintiff his full

9    name.

10         47.    Czodor sent his naked pictures to only one person, which was Plaintiff[2]. RT

11   204. Czodor denied that he told Plaintiff he didn't mind if she shared his nude photos.

12   Czodor alleged that Plaintiff did not reach out to him and ask if it would be okay if she

13   showed other people those nude photos of him. RT 148-149. Czodor had notes indicating

14   that Plaintiff started publishing his nude photos on Sep 5, 2018. Czodor contacted the

15   police the following week for unlawful dissemination of his nude photographs. RT 150-

16   151. Lilly, Czodor's customer on Yelp, received his nude photos and informed him of the

17   incident. RT 159-160. Czodor feels embarrassed to have strangers see his nude photos. RT

18   288.

19         48.    Czodor did not invite Plaintiff over but she showed up at his house on Sep 18,

20   2018. RT 152-153. Plaintiff scratched Czodor's door with her keys for twenty minutes

21   upon arrival but Czodor could not discover the door damages the same night because it

22   was dark. The next day, on Sep 19, 2018, Czodor discovered the damages to his door. RT

23   168, 214. Czodor did not need to take pictures of his damaged front door until six days

24   later when he made a request for restraining order. RT 213.

25         49.    On Sep 24, 2018, the day before Czodor took photos of his damaged door,

26   Czodor learned that the removal of a post related to his credibility would cost money.

27                                       Czodor's Request for DVRO

28   _____
     [2] When CZODOR sent his naked pictures to Plaintiff he did not know her name.

50.    On September 28, 2018 Czodor filed a request for DVRO against Plaintiff in Orange County Superior Court[3]. In the request, under penalty of perjury, he attested that Plaintiff never told him her name.

TRO

51.    On Sep 28, 2018, without affording prior notice and an opportunity to be heard, a TRO was entered by Orange County Superior Court, ordering Plaintiff to remove content from pages on internet what she or her accomplices created to destroy CZODOR's online reputation and to stop posting about CZODOR online.

DVRO hearing

52.    On Oct 19, 2018, without sufficient financial means to secure counsel to defend herself, Plaintiff appeared pro se at the DVRO hearing. At the hearing, CZODOR testified that he met Plaintiff only two times and CZODOR's secret recording was played. In relevant part of the recording, CZODOR stated "Who are you to me? Nobody. You are to me nobody. What you think, what we was? It was my wife, girlfriend, boyfriend, what have you been to me. Jesus Christ. I met you one or two times. And that's it."

53.    After the hearing with a finding that CZODOR and Plaintiff were former partners, a DVRO was entered, ordering Plaintiff to cease posting the picture or likeness of CZODOR or refer to him by name on any social media website or blog, and to remove any pictures or references of CZODOR from any social media website or blog she may have posted, an impermissible post-speech restriction on all contents, viewpoints, and images related to CZODOR.

Amended DVRO

54.    On Oct 1, 2021, without representation of counsel, Plaintiff sought to terminate the DVRO but a first amended DVRO was entered, ordering Plaintiff to not post *any* pictures or likeness of CZODOR or refer to him by name on *any* social media or website or blog that would be *abusive* pursuant to FC§6203 and FC§6320, and to remove *any* pictures or references of CZODOR from any social media websites or blogs she may

---

[3] Orange County Superior Court Case No. 18V002374.

1   have posted.

2                           <u>Prosecution of Plaintiff</u>

3          55.   On August 6, 2019, Plaintiff was charged[4] by misdemeanor complaint with

4   vandalism (Pen. Code,§ 594{a)/(b)(2)(A)), violation of a protective order (Pen. Code,§

5   273.6(a)) (by coming within 100 yards of the protected person), and disorderly conduct

6   (unlawful dissemination of private photographs and recordings) (Pen. Code, §

7   647(j)(4))(A). During the two years prior to jury selection, despite Plaintiff did not request

8   reassignment of counsel, six public defenders cycled through her case with no

9   investigation was conducted.

10         56.   720 days after the complaint was filed, despite no finding of good cause to

11  justify any belated amendment, over defense's objection, the prosecution amended the

12  complaint from allegation of coming within 100 yards of the protected person to failure to

13  deactivate website and created new websites. Amending the complaint 720 days after the

14  original complaint was filed and just one day before the jury trial was held, was a devious

15  attempt to violate Plaintiff's constitutional rights and to prevent Plaintiff from mounting

16  her defense.

17         57.   721 days after the complaint was filed, jury trial commenced on July 27,

18  2021. Without prior discussion with Plaintiff and her consent, public defender signed off a

19  stipulation with the prosecution stating that "on September 28, 2018 a temporary

20  restraining order, which was lawful and valid, went into effect naming Xingfei Luo as the

21  restrained person and Tomas Czodor as the protected person. This temporary restraining

22  order became a permanent restraining order on October 19th 2018." RT 217-219.

23         58.   At trial, no forensic evidence was presented. The state's theory was that (1)

24  Czodor and Plaintiff had a dating relationship; (2) After a fallout in the relationship

25  Plaintiff threatened to publish Czodor's nude photos and did so after making those threats

26  between Sep 5 and Sep 7, 2018 and the following week Czodor reported the said incidents

27  to police; (3) Plaintiff scratched Czodor's front door on Sep 18, 2018 for 20 minutes but

28

---

[4] Orange County Superior Court Case No. 19CM06724.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Czodor discovered the damages on Sep 19, 2018 because it was dark at night. Czodor took photos of the damaged door on Sep 25, 2018 in order to make a police report the next day; (4) Plaintiff did not remove websites as the family court ordered and created new websites.

59.   Czodor, the ONLY witness, testified that he worked as a general contractor and painting contractor that owned a company named Gorgeous Painting. RT 129. Czodor met Plaintiff through dating app Plenty of Fish in early August 2018. RT 130-131. Two or three weeks after their first message they went out on a date. After their first date Czodor send his nude photos to Plaintiff before they met the second time. RT 134. Czodor denied that he had daily communication with Plaintiff. RT 132. Czodor had only two dates in total with Plaintiff. The second date Plaintiff went to Czodor's house but Plaintiff did not spend the night with Czodor. RT 133. Czodor did not even know if any dating relationship started with Plaintiff. Czodor encouraged Plaintiff to meet other people. RT 134. Czodor liked younger women. RT 197. Other than Plaintiff Czodor met only one other person through dating app. RT 199. Czodor portraits himself as a single innocent young man just starting online dating. After his bad experience with Plaintiff Czodor immediately stopped online dating. RT 195. Czodor sent his naked pictures to only one person. RT 204.

60.   Public defender had nothing to offer, even failed to present readily available fact that CZODOR was raised as a nudist, who believes that becoming nude increases confidence and going naked brings him out of his shell.

61.   With public defender's ineffective assistance of counsel and prosecution's intentional proffer of perjured testimony and withholding of exculpatory evidence Plaintiff's was inevitably convicted. While Plaintiff's habeas corpus petition is pending[5] Defendants once again, in January 2023, filed or caused to file a criminal complaint[6] to enforce the invalid and unconstitutional restraining orders. Plaintiff is scheduled to arraign on February 24, 2023.

---

[5] 8:22-cv-01640-MEMF-KES
[6] Orange County Superior Court Case No. 23CM00067.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

62.    After trial, Czodor tried to make himself a windfall out of the case by falsely claiming income loss and providing false income information. While income from the operation of a business or from self-employment is the net income after deducting business expenses (ordinary and necessary expenses required to produce the income) Czodor falsely claimed he had income of $71.5 k in 2017 by providing incomplete income information without deducting his business expenses. He also demanded $54,000 to remove non-existing online statements. When claiming restitution he claimed he made $54 k in 2018 and $63 k in 2019. However, over the years Czodor spent not even a dime to remove the online posts he claimed that destroyed his "reputation."

Post Conviction Discovery

63.    On Sep 10, 2018, the following week, as he claimed, that Plaintiff threatened and published his nude photos, Czodor called Santa Ana Police Department and alleged unfounded terrorism, not dissemination of his nude photos.

64.    The 911 call made on Sep 18, 2018 did not indicate any scratching. In fact, the 911 call made almost 10 minutes after Plaintiff's arrival at Czodor's house, the 911 call clearly indicated only knocking on the door instead of scratching.

65.    Czodor's Yelp page shows no one name Lilly as his customer.

66.    Czodor (1) was previously subject to deportation; (2) was arrested for impersonation; and (3) had prior criminal convictions rested upon facts establishing dishonesty and/or false statements.

67.    Czodor was a longtime married man[7] who concealed his marital status to seek casual hook-ups. Czodor and Hanh Le jointly own a property that was purchased in 2009. Between 2014 and 2019 Czodor and Hanh Le filed taxes as a married couple with pitiful income. Despite Czodor testified he liked younger women, his wife is ten years older than him[8]. Czodor's words are completely contradicted to facts. It suggests that Czodor either

---

[7] Czodor's marital history (crucial evidence to Czodor's credibility, whether Czodor engaged in a dating relationship with Plaintiff, public defender's failure to conduct basic background investigation) was unavailable to Plaintiff until June 2022.
[8] Hanh Le was born in 1972 while Tomas Czodor was born in 1982.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  lied on the stand about liking younger women or committed marriage fraud for

2  immigration benefits because he was previously subject to deportation. Czodor's taxes

3  were inconsistent with his assets and lifestyle which suggests tax fraud.

4  **DECLARATORY JUDGMENT IS NECESSARY**

5      68.  There is an actual and present controversy between the parties. Plaintiff

6  contends that the challenged restraining orders infringe on Plaintiff's right to free speech

7  under the First and Fourteenth Amendments to the United States Constitution. Plaintiff

8  desires an immediate judicial declaration that the challenged restraining orders violate

9  Plaintiff's constitutional rights. Plaintiffs should not be forced to choose between risking a

10  second criminal prosecution or economic sanctions and exercising her constitutional

11  rights.

12  **INJUNCTIVE RELIEF IS NECESSARY**

13      69.  Plaintiff is presently and continuously injured by Defendants' enforcement of

14  the challenged restraining orders insofar as they violate Plaintiff's rights under the First

15  and Fourteenth Amendments. If not enjoined by this Court, Defendants will continue to

16  enforce the challenged restraining orders in derogation of Plaintiff's constitutional rights.

17  Plaintiff has no plain, speedy, and adequate remedy at law. Damages are indeterminate or

18  unascertainable and, in any event, would not fully redress any harm suffered by Plaintiff

19  because she is unable to engage in constitutionally protected activity due to Defendants'

20  ongoing enforcement of the challenged restraining orders.

21  **FIRST CLAIM FOR RELIEF**

22  **Violation of Fourteenth Amendment – Due Process Clause**

23  Against All Defendants

24      70.  Plaintiff re-alleges and herein incorporates by reference the allegations set

25  forth in the paragraphs above.

26      71.  "The prohibition of vagueness in criminal statutes," the decision in *Johnson*

27  explained, is an "essential" of due process, required by both "ordinary notions of fair play

28  and the settled rules of law." *Johnson v. United States*, 576 U.S. 591, 596 (2015) (quoting

18

1   *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926) ).

2   The void-for-vagueness doctrine guarantees that ordinary people have "fair notice" of the

3   conduct a statute proscribes. *Papachristou v. Jacksonville*, 405 U.S. 156, 162, 92 S.Ct.

4   839, 31 L.Ed.2d 110 (1972). And the doctrine guards against arbitrary or discriminatory

5   law enforcement by insisting that a statute provide standards to govern the actions of

6   police officers, prosecutors, juries, and judges. See *Kolender v. Lawson*, 461 U.S. 352,

7   357–358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). The same goes to statutes and court

8   orders that implicate criminal prosecution.

9        72.   California's failure to enumerate the factors to be considered in determining

10  the existence of a "dating relationship" not only fails to enable state trial judges to make

11  informed and consistent determinations but also provides a loophole permitting state trial

12  judges to make arbitrary, capricious, or patently absurd determination to violate Plaintiff's

13  due process right.

14       73.   California's failure to enumerate the factors to be considered in determining

15  the existence of a "dating relationship" enables defendants to enforce invalid restraining

16  orders in violation of Plaintiff's due process right.

17                            **SECOND CLAIM FOR RELIEF**

18            **Violation of Fourteenth Amendment – Due Process Clause**

19                               Against All Defendants

20       74.   Plaintiff re-alleges and herein incorporates by reference the allegations set

21  forth in the paragraphs above.

22       75.   Not requiring a DVRO requesting party to meet his burden of proving by a

23  preponderance of the evidence that a "dating relationship" existed within the meaning of

24  Cal. Fam. Code §6210 violates Plaintiff's due process right.

25       76.   A state family court had no jurisdiction to issue any DVRO against Plaintiff

26  due to the lack of dating relationship between Czodor and Plaintiff. Whether there is

27  substantial evidence to support a finding is a question of law. There is no evidence

28  whatsoever to support the finding that Czodor and Plaintiff engaged in a dating

relationship. Plaintiff was never Czodor's girlfriend in any shape or form. Plaintiff was never Czodor's mistress either.

77.    Czodor, Hanh Le's graceless cheating husband, testified that he did not have daily communication with Plaintiff. RT 132. Czodor had only two dates in total with Plaintiff. The second date Plaintiff went to Czodor's house but Plaintiff did not spend the night with Czodor. RT 133. Czodor did not even know if any dating relationship started with Plaintiff. Czodor encouraged Plaintiff to meet other people. RT 134.

78.    During a secretly recorded conversation on September 18, 2018, Czodor stated "Who are you to me? Nobody. You are to me nobody. What you think, what we was? It was my wife, girlfriend, boyfriend, what have you been to me. Jesus Christ. I met you one or two times."

79.    Czodor's concealment of marital status and the only two meetings between the parties prove that there was no dating relationship between Czodor and Plaintiff. During the entire interaction between the parties Plaintiff never told Czodor her full name. The nature and frequency of the interactions between the parties elaborate just another one-night stand of a married man seeking a casual extramarital sexual favor. There was never any ongoing expectations with respect to the relationship. Neither parties ever demonstrated an affirmation of their relationship before others either by statement or conduct. While Czodor was married to Hanh Le, he openly sought DVRO against Plaintiff which indicates he carries no shame of cheating on his wife. Extending the reach of dating relationship to include one or two casual dates would lead to "absurd" or "unreasonable" applications and abuse of process like this case.

80.    The adjudication of cases by a neutral court is a fundamental element of due process. In domestic violence cases, as in all other court proceedings, the court is responsible for protecting the rights of the accused. *People v. Dorman*, 28 Cal.2d 846, 861 (Cal. 1946). The legitimate concern about domestic violence must not be permitted to affect or diminish the court's responsibility to remain neutral, to protect the rights of the accused in each case, and to address each case individually on its own merits. A culture of

20

1  summarily issuing and extending DVROs would ignore the legislative intent behind

2  DVPA and undermine a basic pillar of our judicial tradition—that all parties be given a

3  fair, meaningful, and equal opportunity to be heard. *C.O. v. M.M*, 442 Mass. 648, 659

4  (Mass. 2004). DVRO proceedings may not violate the due process rights of defendants in

5  an attempt to accommodate plaintiffs. U.S.C.A. Const.Amend. 14.

6       81.   Entering DVRO with no evidence of specific domestic relationship enables

7  defendants to enforce invalid restraining orders in violation of Plaintiff's due process

8  right.

9  **THIRD CLAIM FOR RELIEF**

10  **Violation of First and Fourteenth Amendments – Overbroad Injunctions**

11  Against All Defendants

12       82.   Plaintiff re-alleges and herein incorporates by reference the allegations set

13  forth in the paragraphs above.

14       83.   To establish a valid prior restraint under the federal Constitution, a proponent

15  has the heavy burden to show the countervailing interest is compelling, the prior restraint

16  is necessary and would be effective in promoting this interest, and less extreme measures

17  are unavailable. See *Hobbs v. County of Westchester* (2d Cir. 2005) 397 F.3d 133, 149

18  (*Hobbs*); see also *Nebraska Press*, supra, 427 U.S. at pp. 562-568, 96 S.Ct. 2791. A

19  permissible order restraining future speech "must be couched in the narrowest terms that

20  will accomplish the pin-pointed objective permitted by constitutional mandate and the

21  essential needs of the public order." *Carroll v. President & Com'rs of PrincessAnne*

22  (1968) 393 U.S. 175, 183-184, 89 S.Ct. 347, 21 L.Ed.2d 325.

23       84.   The California Constitution is more protective of free speech rights than the

24  federal Constitution, and California courts require "extraordinary circumstances" before a

25  prior restraint may be imposed. *Wilson v. Superior Court of Los Angeles County* (1975) 13

26  Cal.3d 652, 658-661, 119 Cal.Rptr. 468, 532 P.2d 116; *In re Marriage of Candiotti* (1995)

27  34 Cal.App.4th 718, 724, 40 Cal.Rptr.2d 299 (*Candiotti*). Nonetheless, in determining the

28  validity of a prior restraint, California courts engage in an analysis of various factors

21

similar to the federal constitutional analysis *Aguilar*, supra, 21 Cal.4th at pp. 145-146, 87 Cal.Rptr.2d 132, 980 P.2d 846, and injunctive relief restraining speech under the California Constitution may be permissible where the relief is necessary to "protect private rights" and further a "sufficiently strong public policy" (id . at p. 167, 87 Cal.Rptr.2d 132, 980 P.2d 846 (conc. opn. of Werdegar, J.) ).

85.   Applying these principles, the court in *Candiotti* held a custody order limiting a parent's right to communicate with third parties about matters related to the custody proceeding was an unconstitutional prior restraint. *Candiotti*, supra, 34 Cal.App.4th at pp. 724-726, 40 Cal.Rptr.2d 299. There, the order prohibited a mother from disclosing negative information about her former husband's new wife to anyone except certain specified professionals. *Id*. at p. 720, fn. 3, 40 Cal.Rptr.2d 299. The *Candiotti* court recognized that courts "are given broad authority to supervise and promote the welfare of children" and may constitutionally order parents to refrain from disparaging their former spouse in front of their children. *Id*. at p. 725, 40 Cal.Rptr.2d 299. However, the court observed the challenged order "went further, actually impinging on a parent's right to speak about another adult, outside the presence of the children." (Ibid.) The court held the order was overbroad in this respect and constituted an undue prior restraint of speech under the California Constitution, reasoning the order "would prevent [the mother] from talking privately to her family, friends, coworkers, or perfect strangers about her dissatisfaction with her children's living situation." (Ibid.) Although the trial court "certainly ha[d] the power to prevent [the mother] from undermining [the father's] parental relationship by alienating the children from [the stepmother]," the *Candiotti* court found the challenged order to be "much more far-reaching, aimed at conduct that might cause others, outside the immediate family, to think ill of [the stepmother]." *Id*. at p. 726, 40 Cal.Rptr.2d 299. The court explained: "Such remarks by [the mother] may be rude or unkind. They may be motivated by hostility. To the extent they are libelous, they may be actionable. But they are too attenuated from conduct directly affecting the children to support a prior restraint on [the mother's] constitutional right to utter them." (Ibid.)

86.   In *Molinaro v. Molinaro*, 33 Cal.App.5th 824 (Cal. Ct. App. 2019) the Court held that the part of the restraining order prohibiting Michael Molinaro from posting "anything about the case on Facebook" is reversed, and the trial court is directed to strike the provision from the order.

87.   "When enjoining activities in the sensitive area of First Amendment freedoms, courts must draft temporary restraining orders 'couched in the narrowest terms that will accomplish the pinpointed objective permitted by constitutional mandate and the essential needs of the public order.'" *United Farm Workers of America v. Superior Court* (1975) 14 Cal.3d 902, 909.

88.   Any orders require Plaintiff to remove ALL posts about Czodor from social media and blogs, and bar Plaintiff from future posting of ANY material are clearly overbroad and unlawful, as they encompass speech the court itself recognized as constitutionally protected.

89.   The TRO issued on Sep 28, 2018, while Plaintiff was not present at the ex parte hearing, orders Plaintiff to remove content from pages on internet what she or her accomplices created to destroy Czodor's online reputation and to stop posting about Czodor online. These terms are unconstitutionally vague in their overly broad scope, since they apply to speeches on any subjects, images, and viewpoints provided that they are related to Czodor or his online reputation. Reputation means the beliefs or opinions that are generally held about someone or something. Using DVRO to remedy defamation violates a host of well-established limitations on the defamation tort. A defamation injunction, if allowed at all, can only forbid republication of the precise statements proven defamatory at trial.

90.   The DVRO issued on Oct 19, 2018 provides that Plaintiff is ordered to cease posting the picture or likeness of Czodor or refer to him by name on *any* social media website or blog. Plaintiff is further ordered to remove *any* pictures or references of Czodor from *any* social media website or blog she may have posted. These terms are undoubtedly and unconstitutionally vague in their overly broad scope, since they apply to speeches on

23

any subjects, viewpoints, and images provided that they are related to Czodor.

91.   The first amended DVRO issued on Oct 1, 2021 provides that Restrained Party shall not post any pictures or likeness of the Protected Party or refer to him by name on any social media or website or blog that would be abusive pursuant to FC§6203 and FC§6320. Restrained Party is further ordered to **remove** any pictures or references of the Protected Party from any social media websites or blogs she may have posted. In essence, on one hand the first amended DVRO permits Plaintiff to post any picture or likeness of CZODOR as long as it is not abusive, on the other hand this very order requires Plaintiff to remove any picture or references of CZODOR even though they are not abusive. This order is ridiculously self-contradicted. The order is unconstitutional and has lost its underlying rationale.

92.   All three restraining orders are illegal censorship, impermissible post-speech restriction, unconstitutionally vague and overbroad, a blanket prohibition of speech on all contents, subjects, viewpoints, and images related to CZODOR, Hanh Le's shameless cheating husband.

### FOURTH CLAIM FOR RELIEF

### Violation of First and Fourteenth Amendments – Vague Injunctions

Against All Defendants

93.   Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

94.   There is no bright line definition on what is abusive. An injunction which forbids an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application exceeds the power of the court. *Pitchess v. Superior Court* (1969) 2 Cal.App.3d 644, 651. See also *Gooding v. Wilson*, 405 U.S. 518 (1972) (Finding statute prohibiting "abusive" language unconstitutionally vague and overbroad.)

95.   When the statute's language is capable of reaching protected speech or otherwise threatens to inhibit the exercise of constitutional rights, a stricter vagueness

24

standard applies than when the statute regulates unprotected conduct. See *Village of Hoffman Estates*, 455 U.S. at 497, 102 S.Ct. 1186; *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.")

96.   In *In re Marriage of Suggs*, 93 P.3d 161 (Wash. 2004), the Washington Supreme Court set aside a civil harassment restraining order that barred "knowingly and willfully making invalid and unsubstantiated allegations or complaints to third parties . . . for the purpose of annoying, harassing, vexing, or otherwise harming" her ex–husband, who was a police officer, "and for no lawful purpose." *Id*. at 162. The order, the court held, was an "unconstitutional prior restraint," in part because it "chill[ed] all of [the ex–wife's] speech about [the ex–husband], including that which would be constitutionally protected, because it is unclear what she can and cannot say." *Id*. at 166.

97.   Speech does not lose its protective character simply because it may embarrass others or coerce them into action. See *Naacp v. Claiborne Hardware Co*., 458 U.S. 886, 921 (1982) (Holding that even unpleasant forms of moral suasion — including "'threats' of 'social ostracism, vilification, and traduction'" — are protected by the First Amendment.)

98.   In *Vance v. Universal Amusement Co*., 445 U.S. 308 (1980), the Supreme Court held a Texas statute[9] unconstitutional on the basis that it authorized an invalid prior restraint because it permitted enjoining the future showing of films that had **not yet been found** to be obscene when a movie theater had exhibited obscene films in the past. The burden of supporting an injunction against a future exhibition is even heavier than the burden of justifying the imposition of a criminal sanction for a past communication. *Id*. at 315-16.

99.   Similar to *Vance*, the first amended DVRO prohibiting Plaintiff from posting *any* pictures or likeness of CZODOR or refer to him by name on *any* social media or

---

[9] Art. 4667(a) (Vernon Supp. 1978), provides that certain habitual uses of premises shall constitute a public nuisance and shall be enjoined at the suit of either the State or any citizen. Among the prohibited uses is "the commercial manufacturing, commercial distribution, or commercial exhibition of obscene material." The Court noted that the statute authorized prior restraints of indefinite duration on the exhibition of motion pictures that have not been finally adjudicated to be obscene. *Vance v. Universal Amusement Co*., 445 U.S. 308, 316 (1980).

1  website or blog that would be *abusive* pursuant to FC§6203 and FC§6320 permits

2  enjoining Plaintiff's speech that has not yet been found to be abusive.

3  **FIFTH CLAIM FOR RELIEF**

4  **Violation of Fourteenth Amendments – Equal Protection**

5  Against All Defendants

6      100.  Plaintiff re-alleges and herein incorporates by reference the allegations set

7  forth in the paragraphs above.

8      101.  Each of the challenged restraining orders violates the Equal Protection Clause

9  of the Fourteenth Amendment, both on its face and as applied, because each of them

10  engages in speaker-based discrimination and penalizes Plaintiff based on her exercise of

11  fundamental First Amendment rights and each of them was entered without evidence

12  supporting the finding that CZODOR and Plaintiff were former partners.

13      102.  While other individuals are restrained under DVPA based on evidence of

14  specified domestic relationship, Plaintiff is restrained under DVPA without any specified

15  domestic relationship with CZODOR. Therefore, the enforcement of the challenged

16  restraining orders by Defendants deprived Plaintiff of her right to equal protection under

17  the law as guaranteed by the Fourteenth Amendment.

18  **PRAYER FOR RELIEF**

19      Plaintiff prays that the Court:

20      1.  Enter a declaratory judgment under 28 U.S.C. §2201 that each of the three

21  challenged restraining orders is unconstitutional on its face or, alternatively, as applied to

22  plaintiff, because these orders violate the First and Fourteenth Amendments to the United

23  States Constitution.

24      2.  Enter a declaratory judgment under 28 U.S.C. §2201 that each of the three

25  challenged restraining orders is unlawful on its face or, alternatively, as applied to

26  Plaintiff, because they violated due process clause under Fourteenth Amendment to the

27  United States Constitution due to the lack of evidence of a "dating relationship" within the

28  meaning of Cal. Fam. Code §6210 between the restrained party and the protected party.

1        3. Issue an injunction enjoining Defendants and their officers, agents, servants,

2    employees, and attorneys, and those persons in active concert or participation with

3    Defendants from enforcing each of the three challenged restraining orders.

4        4. Award remedies available under 42 U.S.C. §1983 and all reasonable attorneys'

5    fees[10], costs, and expenses under 42 U.S.C. §1988, or any other applicable law; and,

6        5. Grant any other relief the Court deems just and proper.

7                                                  **VERIFICATION**

8        I, Xingfei Luo, declare that I am the plaintiff of this action. I have prepared the

9    forgoing complaint and believe the matters stated therein to be true. On that basis, I allege

10   they are true.

11       I declare under penalty of perjury that the foregoing is true and correct.

12       Executed on Jan 16, 2023, at Rosemead, California.

13                                 */s/ Xingfei Luo*

14                                 Xingfei Luo

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[10] Plaintiff may retain attorney in a later stage of the proceeding.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF